

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

ATLANTIC WIRELESS, INC.

                    Plaintiff,

        -against-

STELLAR CONNECTIONS INC. d/b/a JW
WIRELESS; RAJEEV DEWAN,

            Defendants.

--------------------------------------------------------------x

Civil Action No.

ECF Case

**COMPLAINT**

Jury Trial Demanded

     Plaintiff Atlantic Wireless, Inc. ("Atlantic" or "Plaintiff") by its undersigned

attorneys, and for its Complaint against Defendants Stellar Connections Inc., d/b/a JW

Wireless ("JW Wireless" or "JW") and Rajeev Dewan ("Dewan") (collectively, the

"Defendants"), alleges on information and belief and otherwise as to its own knowledge as

follows:

### Nature of the Case

    1.     This is an action for breach of contract, fraud, unjust enrichment, and

quantum meruit arising from an agreement between Plaintiff and Corporate Defendant, JW

Wireless, whereby Atlanticand JW Wireless would jointly operate and profit from their

Verizon Wireless cellular service, telephone and accessories master agency business. (For

purposes of this Complaint, Cellco Partnership d/b/a Verizon Wireless shall be referred to

as "Verizon Wireless" or "Verizon".)

    2.     In or about late summer 2012, JW Wireless (a master agent with Verizon

Wireless) approached Plaintiff (a smaller agent with Verizon Wireless) to propose that the

parties might work together to grow Atlantic's business to 20 locations, while extending JW's reach to the East Coast, where it to date did not have any material presence.

3.      After months of discussions, the parties agreed to terms of such joint venture and sale; however, **after** inducing Atlantic to transfer its agency agreement with Verizon Wireless to JW, and **after** obtaining control over all of Atlantic's 10 retail locations, JW breached the parties' agreement and **stopped making payments** to Atlantic that were a large part of the consideration of such transfer. It also withheld commissions payments due to Atlantic in connection with the parties' understanding, and has refused to take over the leases to those properties it deems unprofitable.

4.      Having gained knowledge of Atlantic's financial condition, and having induced Atlantic's transfer of its  agency agreement with Verizon Wireless, thus cutting Atlantic off from any revenue, JW sought to renegotiate the agreement with Atlantic to its own benefit, and has repeatedly tried to change the deal terms and has sought to pay Atlantic a mere fraction of what its business was worth.

5.      Instrumental in this deception and breach has been Defendant Rajeev Dewan, who has made false representations to both Atlantic and to Verizon Wireless in order to back Atlantic into a corner (and to convince Verizon Wireless to transfer Atlantic's accounts to the  company he owned, namely, JW).

6.      Dewan and JW Wireless now claim that no agreement was ever reached, and  are trying to close the deal for less than 50% of the agreed-upon price. JW has completely reneged on contract terms and unilaterally seeks to alter the agreement – all to Atlantic's detriment.

7.     Notably, Defendant Dewan represented to Verizon Wireless and Atlantic that the parties already reached an agreement when the Atlantic agency agreement was transferred even, upon information and belief, falsely representating to Verizon Wireless that JW had made a "down payment" to Atlantic.

8.     Dewan and JW now claim that no such agreement was made, and suggest that no payment need be made for the transfer of a business worth millions.

9.     Defendants cannot, however, have it both ways:  either JW has an agreement with Atlantic, as Dewan represented to both Atlantic and to Verizon Wireless in writing, or he and JW have **defrauded** both Atlantic and Verizon Wireless.

10.     Defendants thus, wrongfully, inequitably, maliciously, and deceitfully have breached the parties' deal, to Plaintiff's detriment.

11.     Plaintiff brings this action to recover its damages from Defendant JW Wireless and Defendant Dewan and seeks, as set forth below, and as may be determined at trial (i) Atlantic's lost profits from its own Verizon agency business; (ii) 75% of the profits from 10 Atlantic stores; (iii) the value of 49% of JW Wireless' profits from 10 retail locations, as the parties had agreed, and which will be proven at trial to be in excess of Five Million Dollars, or, in the alternative, (iv) Two Million dollars ($2,000,000) or the fair market value of the 10 retail locations transferred by Atlantic, to be proven at trial, (v) actual damages of Atlantic arising from the transfer of the business to Defendants and the Defendants' breach, including without limitation, payment to Atlantic of certain payables made in connection with the transfer, any liabilities arising from leases that JW Wireless now seeks to avoid transferring, those security deposits for leases that Atlantic has either

transferred or arranged to be transferred to JW Wireless, and amounts in connection with inventories, to the extent that such recoveries are not duplicative.

**Jurisdiction & Venue**

12.     Plaintiff Atlantic is a Maryland Corporation in good standing, and has, for almost 6 years, been in the business of owning and operating a Verizon Wireless agency that sells cellular equipment and services in ten retail locations in and around New York, Maryland, and Virginia.

13.     Plaintiff Atlantic regularly does business in this district, and has had two locations in this district over which it transferred control to JW Wireless in keeping with the terms of the parties' agreement from which this action arises.

14.     Defendant JW is, upon information and belief, a California corporation having multiple locations, and that now (and for the times relevant to the allegations in the Complaint) regularly does business and profits from retail locations in this district.

15.     Defendant Rajeev Dewan is, upon information and belief, a Virginia resident, who has acted, transacted business in, and profited from business transacted in this district, and in connection with the allegations and causes of action set forth herein, and is subject to personal jurisdiction in this district.  Futhermore, Defendant Dewan has made false statements at or directed towards this district, as set forth below.

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 because it is a civil action in which the matter in controversy exceeds the sum or value of $75,000 and is between citizens of a State and a citizen of a foreign state.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the individual Defendants are subject to personal jurisdiction in this judicial district under New

4

York's Civil Practice and Rules § 302(a)(2) and (3), and JW Wireless is subject to the personal jurisdiction of this Court pursuant to New York's Civil Practice and Rules § 301.

**Factual Allegations Common To All Claims**

18.    Upon information and belief, Defendant JW Wireless is in the business of owning and operating a Verizon Wireless master agency, in which business it sells cellular equipment and services in numerous retail locations as Verizon.

19.    In or about late summer 2012, Defendant Dewan, a principal of JW Wireless, approached Atlantic to propose that JW and Atlantic enter into an agreement whereby the companies would work jointly to expand Atlantic's operations to 20 locations rather than 10, while at the same time, to extend JW's reach to the East Coast, where it, at such time, did not have a material presence.

20.    The goal, as stated by Defendants, was to build the number of locations nominally affiliated with JW so that Defendant could achieve "National" status with Verizon Wireless, meaning that its master agency would obtain many significant commercial benefits including higher commissions, spiffs, and bonuses to name a few advantages over non-"National" master agencies.

21.    JW and Atlantic appeared to have the basis for an agreement. However, during the negotiations, it became clear that a potentially problematic issue would be that Atlantic had a commercial loan outstanding that was, at the time, approximately $1.5 million. This loan was secured by Atlantic's agency agreement with Verizon, among other assets.

22.    Plaintiff raised this issue to Defendants as early as Winter 2012, indicating that that the Verizon agency was subject to the bank's loan and lien, and that Atlantic

5

simply could not sell the business or transfer the agency to JW unless JW assumed the loan or paid it off in full.

23.      Defendant Dewan suggested a "work-around" whereby Atlantic would give up its agency, and would instead be allotted 49% of the profits of JW's 10 stores that the parties planned to open on the East Coast. JW Wireless would be granted a 25% interest in the 10 stores that Plaintiff, at the time, owned and operated.

24.      Defendant Dewan suggested that under the "work-around", Atlantic could continue operating and profiting from Atlantic's then-owned stores as well as its operation of the 10 new stores – all under JW's master agency license with Verizon. Atlantic would thus retain various percentages of the profits in such a scenario as a "75% partner and the manager" of the stores, and JW indicated that it would guarantee the monthly bank loan payments of $35,049, thereby preventing any failure on the part of Atlantic to pay for its bank loan.

25.      At Defendant Dewan's request, Atlantic' president wrote an email to Defendants' two business partners, Leo Y. Lee and Ben Her (who are, upon information and belief co-owners of JW), describing the loan issue and setting forth the parties' discussed solution. A copy of the December 7, 2012 email sent to Rajeev Dewan describing the loan situation with the bank in detail is attached to this Complaint as Exhibit A.

26.      On March 15 and again March 19, Plaintiff provided further explanations why the loan issue was very important, and the parties discussed the fact that the sale would at all times be subject to the loan unless Defendants assumed it or paid it off. A copy of this March 19, 2013 email to Defendants is attached hereto as Exhibit B.

6

27.    The discussions continued.  Defendant JW did not want to assume the bank loan in an official capacity, and said that it did not want to take a loan to pay Atlantic for the stores in a single lump sum.

28.    Instead, JW agreed to make certain that all of the required loan payments were made, and agreed to pay Atlantic $35,049 each month – the exact amount of the monthly loan payment.

29.    JW also agreed that, in return for the transfer of Atlantic's agency agreement to JW, JW would provide to Atlantic a 49% ownership in a to-be-formed entity that would operate 20 locations under JW's master agency license; under this agreement, Defendant JW would own a 25% share of Atlantic, and would share in 25% of the profit from Atlantic's then-owned 10 stores.

30.    Atlantic's principals were to be made directors of JW Wireless, and were to operate the 20 joint-venture stores from which Atlantic would profit.

31.    Atlantic's profit would be 75% of the profits from the 10 transferred stores, and 49% of the profits from the additional 10 retail locations.

32.    The parties entered into a document entitled "Non-Binding Memorandum of Understanding" that set forth the above terms, and which formed the basis for the parties' later agreement, which was consummated upon the transfer of the Atlantic agency agreement to JW Wireless.    A copy of this document (the "MOU") is attached to this Complaint as Exhibit C.

33.    Most importantly, the parties agreed that, in the event that their joint venture did not work out, JW Wireless would pay to Atlantic an established value of

$200,000 for **each** of its ten (10) locations, totaling TWO MILLION DOLLARS ($2,000,000).

34.     Again, due to Atlantic's bank loan, one of the main conditions to the transfer was that JW Wireless agreed to pay $35,049/month in commissions and payments in order to pay down the loan, so that the bank would not assert its security interest in the loan against the locations. Such $35,049 monthly payment would be deducted, the parties agreed, from any commissions otherwise due to Atlantic (but payable to JW) from operating the 20 stores.

35.     Because Atlantic would receive the proceeds and profits from the retail locations, making payments of the bank loan would not be problematic, and, JW assured Atlantic that such payments would always timely be made by JW Wireless **by 5th of every month** so that Atlantic would not default in the repayment obligations of such loan. Defendants actually made the first two payment timely.

36.     JW also knew that Atlantic was under the pressure of the bank loan, and in late April 2013, further indicated, through Defendant Dewan, that Verizon had told Dewan that Atlantic's agency agreement would not be renewed, and that Atlantic would be soon terminated.

37.     On April 26th 2013, Defendant Dewan informed Atlantic's president during a conversartion that he had a telephone conference with Robert Milton, director of Verizon Wireless for the Washington/Baltimore/Virginia area, earlier that day, and during such conversation, Robert Milton told Dewan that Atlantic's agency agreement would not be renewed.

38. Defendant Dewan indicated to Atlantic that the "work around" joint venture was the only way to save Atlantic's assets, but that it must be done immediately and in reliance on the parties understanding set forth in the MOU, attached here as Exhibit C.

39. Upon information and belief, Dewan's statements were knowingly false, and were made to induce Atlantic to enter into the "work around" and transfer its agency agreement and accounts with Verizon to JW.

40. Dewan knew that Atlantic, being a small agent of Verizon, would reasonably rely on such false statements, to Atlantic's detriment, and to JW's benefit.

41. JW Wireless and Atlantic agreed on these terms, and in May 2013 cooperated to transfer the plaintiff's Verizon Wireless agreement to JW Wireless.

42. Defendant JW Wireless facilitated and accepted the transfer of Atlantic' agency accounts to JW Wireless, and further represented to Verizon Wireless that, in keeping with the parties' understanding, it was purchasing Atlantic' stores and integrating the stores into the JW Wireless agency umbrella.

43. Notably, and in stark contrast to the position it is now taking, JW Wireless unequivocally represented to Verizon Wireless and to Atlantic that Atlantic and JW Wireless had reached an agreement governning the transfer of the agency agreement and stores to JW Wireless.

44. Dewan continued to use Atlantic to his benefit to scout locations and build out stores for JW Wireless' own interest. After the stores constructions were completed and stores were opened for business, Dewan told Atlantic principals to "Back off".

45. Atlantic thereafter substantially and almost completely performed its obligations under the parties' agreement, which obligations included (i) transferring its

agency agreement/license to JW, (ii) turning over control of ten (10) retail locations to JW, (iii) paying $234,000 to Verizon in connection with a merchandise credit line (and later, an additional $306,000 in that connection), and (iv) continuing to work to expand JW's East Coast presence in Maryland, Virginia, Pennsylvania, New Jersey, New York and Boston. Atlantic further has made available leases and/or renewals for almost all of the Atlantic locations – the only delay being JW's recent refusal to take over certain leases, and completely new, after the fact insistance that it will take only those leases of locations it deems profitable.

46.     JW, of course, knew of, and accepted such performance by Atlantic.

47.     Atlantic, however, would not have so performed if it were not for its belief in the false statements made by Dewan that Verizon was shutting Atlantic down, and also its reasonable understanding that the parties were proceeding pursuant to the terms of their agreement.

48.     Originally, the transaction began well.  JW Wireless, in keeping with the parties' agreement, paid Atlantic in connection with Atlantic's operations of the stores in June, bought inventory from it so that the inventory could be sold in the stores, and made the all-important monthly payments of $35,049 for two months (in July and August of 2013) so that Atlantic could pay its lender.

49.     In further keeping with the original agreement, JW also appointed one of Atlantic's senior employees to be the "Director of North East Operations", as the parties had agreed.  For two months, using the erstwhile Director of North East Operations' guidance and expertise, the stores were operating smoothly pursuant to the terms of the

parties agreement. However, JW then took over operations and then JW began to try to unilaterally change the deal.

50.     JW Wireless removed the Director of North East Operations on August 1, 2013, and banned Atlantic from entering or operating any locations in Maryland and Virginia.

51.     JW allowed Atlantic to enter 2 New York stores, Glen Cove and Plainview to run and operate the 2 stores. Later, on October 31, 2013, JW further removed Atlantic from running and or operating those New York locations, as well.

52.     Moreover, **after** obtaining Atlantic's surrender to Verizon Wireless and transfer of its agency agreement to JW Wireless, and after acknowledging that JW Wireless entered into an agreement with Plaintiff (and further after falsely representing to Verizon Wireless that JW Wireless made a payment to Atlantic, which it had not), and after gaining control over (and profiting from) the 10 Atlantic stores, JW Wireless said that there was no deal, and tried to change the terms of the parties' agreement.

53.     Despite Atlantic's performance of its obligations, and despite their promises to the contrary and representations to Verizon Wireless, JW sought to repudiate the joint venture, after telling Atlantic that the companies were "no longer partners."

54.     JW Wireless then began to withhold commissions and profits from Atlantic, including the promised payments relating to Atlantic's loan – payment of which JW had always guaranteed.

55.     Having cut off Atlantic from its entire business, and knowing full well it had to make the loan payments (which loan was secured by various personal collateral of

the Plaintiff's principal and his family), JW Wireless told Atlantic it was changing the nature and terms of the parties' agreement.

56.     JW Wireless said that it had reconsidered the joint venture and that it would pay to Atlantic **less than half** what it had originally agreed to pay for the 10 stores.

57.     Atlantic, predictably, refused to bow to JW Wireless' strong-arm tactics, and sought a buy out of its stores as the parties had valued them – i.e. $200,000/each, for a total of two million dollars ($2,000,000).

58.     JW now disavowed its agreement and refused to pay the agreed-upon amount, which was a material basis for the transfer of the Atlantic agency agreement and control over the stores.

59.     Moreover, JW Wireless now has withheld the agreed-upon monthly bank loan payments of $35,049, so that Atlantic would not be able to pay its commercial loan, and, using such duress and leverage, has sought to force Atlantic to accept lesser payment terms, knowing full well that a default by Atlantic could ruin both the company and also its principals.

60.     JW created a financial default by pulling out on the last minute on the Atlantic loan by not making the payment on the due date of September 5, 2013, which Atlantic scrambled to cure, paying a late fee of more than $5,000.

61.     Atlantic refused to succumb to Defendants' wrongful tactics and now brings this litigation to enforce its rights.

### As and For a First Claim for Relief
(Breach of Contract)

62.     Atlantic has at all times complied with its obligations to JW Wireless under the parties' joint venture agreement.

12

63.     JW Wireless has accepted Atlantic's performance, and for months has benefitted and profited from the transfer of the ten (10) locations transferred to it under the agreement and the transfer between JW, Verizon Wireless and Atlantic.

64.     Atlantic has further made almost all of the 10 locations' leases available for transfer, whether by renewal or assignment, and has further made substantial post-transfer efforts in keeping with the parties' agreement to help JW expand and solidify JW's East Coast presence.

65.     JW accepted all of these efforts and consideration, and has earned substantial revenues from the stores.

66.     JW has only now sought to cherry-pick the locations that it feels are profitable, refusing to enter into all the leases for the former Atlantic locations.

67.     JW Wireless, for its part, has completely failed to perform under the parties' agreement, and has failed to provide to Atlantic 49% of the profits of the joint venture, and has further failed to timely pay to Atlantic the commissions earned from Atlantic's ten locations.

68.     After making two payments in connection with Atlantic's loan (one for each July and August), JW Wireless has ceased to make monthly payments to Atlantic or directly to bank, of the agreed-upon $35,049 in connection with such loan.

69.     Atlantic has been damaged by Defendant's breach, and accordingly seeks recovery from Defendant JW as follows: (i) in an amount of its lost profis from the Joint Venture with JW, believed to be not less than $5 Million Dollars, (ii) the costs, fees, penalties, interest, expenses and attorneys fees incurred by Atlantic in connection with non-payment of the loan, and/or (iii) the greater of (a) payment to Atlantic of $2,000,000 in

keeping with the valuation agreed-upon by the parties for the ten Atlantic stores transferred to JW under the Atlantic agency agreement, or (b) the fair value of such stores at the time of transfer, as may be proven at trial.

### Second Cause of Action
(Unjust Enrichment)

70.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

71.     Plaintiff has transferred certain assets and contracts to Defendants and has performed services incident to the transfer and in keeping with the expansion of the Defendants' business.

72.     Defendants have been, and continue to be, enriched by Plaintiffs' transfer and performance of services, at Plaintiffs' expense and to its detriment.

73.     Defendants have denied that there is any contract between them and the Plaintiff.    Plaintiff alleges that such an agreement exists, but in the alternative, if as Defendants claim, it should be determined that there is no contract between the parties, the principles of equity and good conscience dictate that Defendant not be permitted to withhold and retain the benefits conferred upon it by Plaintiffs.

74.     Accordingly, Plaintiff seeks recovery from Defendant JW in an amount equal to fair market value of the ten (10) stores it provided to JW, plus the value of the services thereafter provided by Plaintiff, which amount, Plaintiff alleges, shall not be less than $2,500,000 or some greater amount to be determined at trial.    Alternatively, Plaintiff seeks recovery from JW in the amount of $200,000/store as agreed upon by the parties (totaling, $2,000,000), plus the value of Plaintiff's services.

### Third Cause of Action
(Constructive Trust)

75.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

76.     The relationship cultivated over time during which JW Wireless worked with Atlantic has established in Defendants a relationship of fiduciary responsibility and loyalty to Plaintiff, particularly as the parties have, at all times, have been engaged in a business venture that they have intended to formalize.

77.     Based upon such relationship, Defendant JW Wireless represented to Atlantic that the parties were partners, and even put the principal of Atlantic on JW's board of directors, in recognition of the parties' relationship.

78.     Such reliance caused assets and revenues to flow directly to Defendant JW from Verizon Wireless, which Defendant is now trying to keep for itself in violation of the parties' joint venture agreement.

79.     Plaintiff has further now been cut out of any cash flow, by the Defendants' bad acts, even though Defendant continues to profit directly from Plaintiff's transferred stores, as all of the commissions and cash flow to such stores is paid by Verizon Wireless directly to JW.

80.     Defendant's recent rejection that any contract between the parties exists violates the special relationship between the parties.

81.     Plaintiff thus risks being further damaged by Defendant's inequitable conduct and violations of the parties' special relationship, and is likely to suffer irreparable harm in the absence of a direct payment to it of the benefits it has earned.

82.     In equity, Defendant should not be permitted to retain those assets and revenues from the operation of the stores that Plaintiff operates and/or the stores that it has transferred.

83.     In light of the foregoing, Plaintiffs request that a constructive trust be imposed on all assets and revenues in connection with the 10 former Atlantic stores, as well as the revenues payable by Verizon Wireless to JW from which JW is being wrongfully enriched to Atlantic's financial detriment.

84.     During such time as such trust is imposed, any non-operating profits from the ten formerly Atlantic locations should be held for the benefit of Atlantic, so that such moneys are not utilized to enrich the defendants for their bad acts.

### Fourth Cause of Action
(Accounting)

85.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

86.     JW Wireless has refused to pay to Plaintiff its due, and because the parties had agreed that Plaintiff will be paid a percentage of the profits from the projects in connection with which they both performed services, and in particular in connection with those stores transferred by Plaintiff; Plaintiff is entitled to an accounting of JW Wireless' books and records since May 2013.

### Fifth Claim for Relief
(Quantum Meruit)

87.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

88.     Plaintiff transferred its Verizon agency agreement and performed services in good faith, and reasonably expected – and and was, in fact, led to believe – that it would be compensated therefore through a joint venture where by Defendants would share with Plaintiff seventy-five percent (75%) of the total profit JW received from the ten (10) stores transferred by Atlantic, plus forty-nine percent (49%) of the ten (10) other stores opened by JW Wireless on the East Coast.

89.     Defendant accepted Plaintiffs' transfer of stores and the performance of these services, and profited from that transfer and performance, while now refusing to share any profits with or otherwise properly compensate Plaintiff.

90.     As a result, Plaintiff is entitled to recover from the Defendant (i) an amount not less than 75% of the profits of the ten (10) transferred stores, 49% of the additional stores opened by JW, and (ii) $2,000,000, or, (iii) the fair market value of Plaintiff's stores and services, to be determined at trial.

### Sixth Cause of Action
(Fraud and Deceit)

91.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

92.     On or about April 24, 2013, and throughout that month, Defendant Rajeev Dewan made a knowingly false representations to Atlantic in connection with Verizon's (apparently non-existent) plans to shut Atlantic down.

93.     Atlantic was led to believe JW enjoyed a close relationship with Tami Erwin, CMO of Verizon and so Atlantic reasonably relied on such material and false representations made by Dewan, to Atlantic's detriment.

94.     JW knew that Atlantic and its principals were under substantial financial pressures from the bank loan and that potentially losing the Verizon agency contract would lead Atlantic to transfer their agency based on the proposed "work around" in haste.

95.     Plaintiff relied on JW's misrespresentations to its detriment, and would not have transferred its agency contract to JW in the absence of such representations.

96.     Plaintiff has therefore been damaged by Defendants' fraudulent misrepresentations in an amount not less than $5,000,000.

### Seventh Cause of Action
(Injunction/Indemnification)

97.     Plaintiff repeats and realleges the above paragraphs with the same force and effect as if set forth in full herein.

98.     Atlantic has at all times prior to this action made known to JW Wireless the terms of the leases for the ten (10) stores that JW Wireless took over from Atlantic.

99.     In connection with such stores, JW Wireless agreed to take over, renew or otherwise assume such leases.

100.    Atlantic has made such leases available, but now JW Wireless seeks to avoid its obligations, and has refused to assume or renew certain of the leases, and has further failed to pay to Atlantic the security deposits that are being transferred and now are held for JW's account.

101.    JW Wireless has further breached the parties' agreement and has damaged Atlantic.

102.    Accordingly, JW should be ordered to assume the leases on the same or reasonably similar terms as enjoyed by Atlantic; and to pay to Atlantic each and every

security deposit that such landlords transferred to JW, but which had originally been paid by, and held for the benefit of, Atlantic in connection with such leases.

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A)      On the First, Second and Fifth Causes of Action, that JW Wireless pay to Plaintiff  the greater of $2,000,000 or the fair market value of the stores transferred to JW Wireless as of the date of such transfer;

B)      On the First Cause of Action, and in addition to the foregoing, the costs, fees, penalties, interest, expenses and attorneys fees incurred by Atlantic in connection with the Atlantic Wirless bank loan;

C)      On the Second and Fifth Causes of Action, and in addition to the foregoing, the value to be determined at trial of the assets and services provided to Defendant;

D)      On the Third Cause of Action for Relief, that a constructive trust be imposed on all assets and revenues payable by Verizon Wireless to Defendant arising from the ten (10) stores, or any of them, transferred by Atlantic to JW Wireless;

E)      On the Fourth Claim for Relief, that the Defendant be ordered to provide to Plaintiff a full and appropriate accounting from the period May 2013 to the then-present time;

F)      On Plaintiff's Sixth Claim for relief, that the individual defendants, along with JW Wireless, jointly and severally, pay to Atlantic the damages caused by Defendants' false representations, including Plaintff's lost profits, the amount of

profits wrongfully earned by Defendants, and punitive and exemplary damages due to the wanton, malicious, and intentional acts of Defendants;

   G)  On Plaintiff's Seventh Claim for relief, that JW Wireless be ordered to assume the leases on the same or reasonably similar terms as enjoyed by Atlantic, and to pay to Atlantic each and every security deposit that such landlords transferred to JW Wireless' account, but which had originally been paid by, and held for the benefit of, Atlantic in connection with such leases.

   H)  That Plaintiff have and recover the taxable costs and expenses;

   I)  That Plaintiff have such other and further relief as the Court may seem just and equitable.

Dated: November 8, 2013
   New York, New York

## JURY DEMAND

  The Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

By:     _____
       Stephen Nakamura (SN - 4187)
       MERLE, BROWN & NAKAMURA, P.C.
       *Attorneys for plaintiff*
       90 Broad Street, Suite 2201
       New York, New York 10004
       Tel. (212) 471-2990
       Fax (212) 471-2990
       E-mail: s.nakamura@mbnpc.com

**EXHIBIT A**

**Zeynel M. Karcioglu**

| | |
|---|---|
| **From:** | Bawa Bhasin <bawa@cellhut.com> |
| **Sent:** | Friday, December 07, 2012 12:34 AM |
| **To:** | 'rajeev dewan' |
| **Cc:** | Rameet Bhasin |
| **Subject:** | Follow up to our meeting this evening |

Dear Rajeev Ji,

It was nice meeting as always despite the fact you were so tired today. Hope you had a good night sleep.  As discussed below are the points that needs your attention along with Leo's and Ben's consent to move forward.

      Your proposal and request to surrender Atlantic wireless license is agreed.

      Your proposal to keep all the Atlantic stores under our Jay/Stella under our existing management and control is also agreed.

      It is also further agreed to expand the Northeast market under our new partnership of Jay/Stella. We are all for this.

      Atlantic at inception in 2008 borrowed a loan from NYCB bank for $5.3 M and has made payments totaling  $3.8 M ($1M of $3.8M was brought from my savings to pay the debt down) in total till date reducing the debt to $1.5M with ongoing payments of $35K for next 43 months starting Jan 2013.  My audited financials do provide the same details.

      Atlantic surrendering the license of Verizon Wireless needs to pay the remaining entire balance of $1.5M back to the bank.

      Atlantic at present is getting three year license renewed with a Premium License from Verizon.

      This license secures our remaining payments to pay down this remaining loan for next 43 months.

      We request once we surrender the Atlantic license our existing loan can be financed by Jay/Stella and we can continue to pay the $35K monthly payments monthly to Jay/Stella.

      Jay/Stella can deduct the monthly payment of $35K while paying our balance commission every moth till the debt is fully paid off.

      Jay/Stella will have our existing 11 stores  and their commissions from Verizon as guarantee.

      Jay/Stella will also have our new profits also in the new partnership operation and can serve further as a guarantee.

      There will be quite a good amount of money to secure this payment at all times.

      We need to pass this hurdle and move our new expansion partnership operation in full gear.

Please advise and provide your thoughts on this.

**Thank you**
**Bawa Bhasin**
**Atlantic Wireless**

**_verizon_**wireless
Authorized Retailer

**82 School Street,**
**Glen Cove, NY 11542**
**Cell: 516-356-9800**
**email: bawa@atlanticwireless.org**

1

**EXHIBIT B**

**From:** Bawa Bhasin
**Sent:** Tuesday, March 19, 2013 10:17 AM
**To:** rajeev dewan; Leo Lee; Ben Her
**Cc:** Rameet Bhasin
**Subject:** RE: Draft Finacials Attached

Hello Everyone,

See below my email sent last Friday. I am following up to your discussions what I had yesterday evening. Here are the facts which are binding me with the bank.
I have signed negative pledge with the bank that I cannot change Verizon commission account number or method of receiving their commission prior to their consent.
My collateral and guarantees are strong and never delayed any payment whatsoever.
Not renewing or surrendering my Verizon License will incur the bank to recall the loan as the loan was based on Verizon License.
The bank fails to understand my position of going with JW/Stella even if my growing  and expanding with more stores and having more receivable.

As long as I have this bank loan I cannot give up my Atlantic License with VZW. My loan agreement binds me to this.

In the interim, I am going to meet another bank this afternoon and see what they have to offer and if accepted how soon they are willing to do so.

While I am searching for a solution and make this work here are some thoughts to follow up for you to consider where I need your help:

1.  JW/Stella can payoff the existing Atlantic loan ($1.47M) and become 50% owner of Atlantic 10 existing stores. You continue to enjoy 50% of the profit which will be equivalent or more than my current monthly bank payment that is $35K. This way in three years or sooner you can have your money out.

2.  JW/Stella can payoff the loan for Atlantic.  Atlantic and myself provides promissory note, collateral and all guarantees (even double the amount to secure you dully). We will continue to make the $35K payment every month till the loan is paid off. You can deduct this amount every month before releasing Atlantic commission for existing 10 stores.

3.  JW/Stella can allow the existing Atlantic 10 stores setup as is so that the existing bank loan can be paid off  for next three years. After three years these stores get transferred to JW/Stella.  I further invest 50% with JW/Stella to operate and function the new business/stores and grow the same.

**Thank you**
**Bawa Bhasin**
**Atlantic Wireless**

*verizon*wireless
*Authorized Retailer*

**82 School Street,**
**Glen Cove, NY 11542**
**Cell: 516-356-9800**
**email: bawa@atlanticwireless.org**

**EXHIBIT C**

# Memorandum of Understanding

This memorandum of Understanding (the memorandum) is made on Tuesday, April 16, 2013, by and between Stellar Connections Inc. dba JW Wireless, of 846-A E Valley Blvd, San Gabriel, CA 91776, hereinafter referred to as JW and Atlantic Wireless, Inc., of 82 School St, Glen Cove, NY 11542 hereinafter referred to as AW will be operating jointly.

Part 1

1.1 Whereas JW will be acquiring 25% share of AW and 10 lease holding companies of Atlantic Wireless, Inc. which are operating in or at:

Springfield Plaza 6300A Springfield, Springfield, VA 22150

Burtonsville 15610 Old Columbia Pike, Burtonsville, MD 20886-1630

Lexington Park 46240 Lexington Village Way, Lexington Park, MD 20653

Dunkirk 10394 Southern Maryland Blvd, Dunkirk, MD 20754-3030

Waldorf 11110 Mall Circle, Waldorf, MD 20603-4803

Beltway Plaza 6100 Greenbelt Road, Greenbelt, MD 20770-4064

Downtown Silver Spring 8636 Colesville Rd, Silver Spring, MD 20910-3915

La Plata 58 Drury Drive, La Plata, MD 20646

Plainview 329 South Oyster Bay Rd, Plainview, NY 11803

Glen Cove Long Island 82 School St, Glen Cove, NY 11542

1.2 The purpose of this memorandum is to provide the framework and outline for any future binding contracts operating jointly between JW and AW for total of 20 location(s). Description of locations:

1.2.1 10 pre-existing locations of 10 lease holding companies of Atlantic Wireless, Inc mentioned above

1.2.2 1 location currently operating as JW Wireless at 9444 Main St, Fairfax, VA 22031

1.2.3 2 executed leases through JW

1.2.4 7 locations TBD

### 1.3 Obligation of the Parties Involved

The parties acknowledge that no contractual relationship is created between them by this memorandum, but agree to work together in the true spirit of partnership to ensure that there is a united visible and responsive leadership by means of the following individuals.

### Part 2 New Business

**2.1** JW and AW agree that they will be forming a new company with JW owning 51% and AW owning 49% (in return of 25% shares awarded to JW from AW) to operate 10 locations per Part 1.2 of this memorandum at a later time.

### Part 3 Exit Plan

If either party decides to sell, transfer or buyout any shares of either party, the following valuations have been established by this memorandum or future executed agreement (s) are as follows:

| | |
|---|---|
| 1.2.1 | have been valued at $200,000 per door |
| 1.2.2 | have been valued at $100,000 per door |
| 1.2.3 | have been valued at $100,000 per door |
| 1.2.4 | have been valued at $100,000 per door |

The arrangements made by the parties for this Memorandum shall remain in place from Tuesday, April 16, 2013 unless either party decides to cancel this arrangement.

_____        4/16/2013

Leo Y. Lee                    Chairman          Date

_____        April 16ᵗʰ 2013

Harminder S. Bhasin              President          Date